Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
208-724-2617
chd@fergusondurham.com

Richard Alan Eppink
WREST COLLECTIVE
812 W. Franklin
Boise, ID 83702
208-371-9752
ritchie@wrest.coop

Attorneys for Defendant Roberts

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BROOKS ROBERTS,<br><br>    Defendant. | Case Nos. 1:23-cr-00053-DKG-2 and 1:23-mj-00108-DKG-2<br><br>**BROOKS ROBERTS' SENTENCING MEMORANDUM** |

1

## SENTENCING RECOMMENDATION

The Government and Brooks Roberts reached a binding plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. (23-mj-108 Dkt. 69, 23-cr-53 Dkt. 57). That means, per the Rule, that the sentencing recommendation in the plea agreement binds the Court once the Court accepts the plea agreement. Probation's recommendation (23-mj-108 Dkt. 93, 23-cr-53 Dkt. 85) tracks the plea agreement's sentencing provisions exactly:

- Time served
- No fine
- No restitution
- Unsupervised probation for three years, with these conditions:
    - Brooks will not commit another federal, state, or local crime
    - Drug testing suspended
    - Brooks will pay the $35 special assessment
    - Brooks will not enter or remain on National Forest or BLM lands for the purpose of camping or living on those lands

Brooks and his counsel recommend the Court follow the binding plea agreement and Probation's recommendation. This sentencing memo offers the Court additional information to understand important context as it considers the sentencing factors in this case.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Brooks Roberts has entered guilty pleas to one count of leaving refuse on BLM land and to one count of using Forest Service land for other than recreational purposes.

2

While Brooks admits his guilt and takes responsibility for choices that he made, these infractions were the result of an avalanche of tragic events beyond Brooks's control that came cascading down on him over the last three years.

Brooks and his family, who he's lived with all his life, were evicted from their family home in Emmett during the height of COVID-19's scourge across the world. (PSR (23-mj-108 Dkt. 92, 23-cr-53 Dkt. 84) ¶¶ 19, 48–50.) Their eviction came during the Treasure Valley's still-ongoing housing crisis: there is simply not enough housing, much less affordable housing, available here—and the same is true in the McCall area, where Brooks and his family eventually found themselves as they tried to get back on their feet. (Schroeder Report 10.) The number of families who need housing exceeds the available supply by hundreds and thousands. (*Id.*)

The same is true for emergency housing, like homeless shelters, where some people can sometimes go after being turned out of their home. In Ada County, each night there are twice as many people looking for emergency shelter beds as there are beds. (*Id.* at 3.) There are, at least, social services to help families, like the Roberts family here, get on waiting lists for stable housing to recover from an eviction. (*Id.* at 6.) Brooks, in particular, worked with those social services, beginning in 2022. (PSR ¶ 22.) But because of the ongoing housing crisis, families like the Roberts generally have to wait at least **two years** to make it to the end of lengthy waitlists and find affordable housing. (Schroeder Report at 3, 9.) Having connected with social services in summer 2022, the impact of the crisis means it would have been November **2024** before those social services would have been able to house them. (*Id.* at 9.)

3

And even had any emergency shelter beds been open, they could not accommodate Brooks's work schedule at Walmart, where he was a janitor assigned to the overnight shift. (*Id.* at 11; PSR ¶¶ 22, 58.) Or, if he had quit his job, abandoning his only income so that he could go into an emergency homeless shelter, he still wouldn't have been able to stay there for the two years it would have taken to get housing again. (Schroeder Report at 4, 12.) And after Brooks got hurt on the job and was left wheelchair bound, the emergency shelters would not have been a healthy place for him at all, given his disabilities. (*Id.* at 11.)

Just as it is important that Brooks has acknowledged that he made the wrong choices when he left his garbage on BLM land and stayed in a recreational National Forest site when he wasn't recreating (*see* Plea Agreement at 3), it is important to acknowledge the context in which he and his family had to make those choices. That the Roberts family ended up eking out survival on federal land is part of a broader social crisis that has pushed people experiencing homelessness into precarious places like these—an awful trend that officers for both the Forest Service and the BLM have been well aware of for years now. (Schroeder Report at 12; Madelyn Beck, "Western housing crisis leads some to live on public lands," Boise State Public Radio (April 8, 2022), [https://www.boisestatepublicradio.org/economy/2022-04-08/western-housing-crisis-leads-some-to-live-on-public-lands](https://www.boisestatepublicradio.org/economy/2022-04-08/western-housing-crisis-leads-some-to-live-on-public-lands).) Though Brooks' brother Timber, as he acknowledged to this Court at his own sentencing, made worse choices in his interactions with others, the Government has not charged Brooks with such offenses.[*]

---

[*] Although the PSR notes that "the family was frequently argumentative with officers and used expletives at them" and that there were some complaints "about being harassed by the Roberts family," that presumably refers just to Timber—not Brooks. (PSR ¶¶ 19, 26 (emphasis added).) Likewise, what Timber did when he was arrested has

4

In all, the nature and circumstances of Brooks's misdemeanor offenses highlight that his culpability is mitigated by a severe lack of housing options for folks in his position

## BROOKS' HISTORY AND CHARACTERISTICS

Brooks is a lifelong Idahoan. (PSR ¶ 47.) He grew up with an alcoholic father who beat up his mom. (*Id.* ¶ 48.) He is probably autistic and, like his brother, Brooks was unceasingly bullied throughout school. (*Id.* ¶¶ 50, 54.) After the family was evicted during early peak of COVID-19, Brooks worked doggedly at Walmart in hopes they could save up enough to rent a place to live again. (*Id.* ¶ 58.) He worked the third shift as a janitor, but one night injured his back while taking out the trash. (*Id.* ¶ 53.) He has had to use a wheelchair ever since. (*Id.* ¶¶ 22, 53.)

He began working with a Boise social services non-profit, CATCH, in summer 2022, to try to find stable housing for the family. (*Id.* ¶ 22.) But despite making some progress toward that goal, BLM gave the family an October 2022 deadline to move off of the site where CATCH had found them. (*Id.* ¶ 24.) This pushed them outside of the Treasure Valley, where CATCH could help, and up to the McCall area, where there is no emergency shelter and no social services like CATCH. (Schroeder Report at 10, 12.) On top of that, the winter of 2022–2023 dumped nearly 26 feet of snow at nearby Brundage Mountain, leaving the family snowed in.

Although by May 2023 Brooks and his mom and brother each had counsel appointed by this Court, the Government made the fateful decision to forcibly arrest the entire family and do it by surprise. Although the government filed new misdemeanor no bearing on how Brooks should be sentenced. (See PSR ¶ 28.)

charges and got arrest warrants for Timber, Brooks, and Judy, no agent contacted the Robertses' appointed attorneys. No agent reached out to see if they would surrender on these charges, as they had before.

A little after 8:30 am MDT on May 19, 2023, with a uniformed officer hiding in the back seat, two plainclothes officers, both in flannel shirts and jeans, drove an unmarked pickup to and parked near the Robertses' fifth wheel. (23-mj-108 Dkt. 79-4 (5/19/23 on-body video (OBV)).) They lingered for a few moments, pretending to read the signboard. *(Id.* at 10:43:44 (on watermarked timestamp).)They then knocked on the RV and told Judy that they needed a jump because they had a dead battery (*See id.* at 10:45:07.) Timber quickly emerged to help them. (*Id.* at 10:46:41.) He moved his mother's pickup to where the unmarked truck was parked with its hood up. (*Id.* at 10:47:40.) Unknown to the Robertses, however, a backup force of many federal and state officers waited nearby, out of sight.

As Timber moved between his mother's truck and the unmarked police truck, the two plainclothes officers grabbed him. (*Id.* at 10:48:30.) He had a broken arm that had just come out of a cast. He began to scream in pain, yelling for help, as the officers struggled to subdue him. (*Id.* at 10:48:37.)

Hearing the screams of his brother, Brooks grabbed a small .22 revolver in the RV, opened the door, and jumped into his wheelchair. (*Id.* at 10:49:18.) He wheeled toward where he heard the screaming. At the same time, the backup officers began speeding in their cars toward the same area, with their sirens on, from the other side of the parking lot.

As Brooks rounded the corner of Judy's truck one of the plainclothes officers, without warning or identifying himself, immediately opened fire on Brooks. (*Id.*) As soon as Brooks realized law enforcement was present, he tossed the gun and fell out of his wheelchair. Waiting a few beats, the uniformed officer who had been hiding in the truck then also fired repeatedly at Brooks, including while he lay helpless in the mud.

Brooks was shot through his arm, in his armpit, through his back shoulder, the middle of his back, and several times in his legs. A bullet pierced his spine and lodged there. Excerpts from officers' on-body video of the ruse, the shooting, the Brooks's interaction with officers immediately after captured the shooting and its aftermath:

- [Excerpts from on-body video recorded by Officer Lockner](#)
- [Excerpts from on-body video recorded by Officer Brizzi](#)



*Screen capture from on-body video, seconds after the shooting stopped*



*Brooks' toppled bullet-ridden wheelchair, with his revolver several feet away, where they rested after the shooting*

Brooks did not fire a shot, and his gun was out of his reach on the ground, several feet away. While still bleeding in the mud, among Brooks' first words with the officers after the shooting stopped was to apologize, explaining that he did not know they were the police when he came out to protect his kin. (Brizzi OBV excerpt, linked above.)

As a result of the shooting, Brooks is now paralyzed from the chest down and has only limited use of his right arm. He likely will never recover the use of his lower body. He cannot control his bowels and requires a diaper. His recovery will be slow and difficult.

8

What Brooks has endured through this case and his already difficult life that preceded it further underscores that the binding sentencing recommendation is sufficient under 18 USC § 3553.

**SERIOUSNESS, JUST PUNISHMENT, DETERRENCE, PUBLIC SAFETY, AND CORRECTIONAL TREATMENT**

Brooks is to be sentenced for two low-level misdemeanors defined by administrative regulation: improperly disposing of garbage and occupying a recreation site for purposes other than recreation. (Plea Agreement at 2–3.) Accompanying this sentencing memo is an expert report by Wyatt Schroeder, former Executive Director of the CATCH (the same agency that had begun working with Brooks to re-house his family) and then Director of Community Partnerships for the City of Boise Mayor's Office. (Schroeder Report at 2.) Mr. Schroeder's report makes plain that sentencing Brooks Roberts for these administrative misdemeanors is not going to cure homelessness or solve Idaho's housing crisis at even the micro-level of Brooks and the Robertses, much less any more broadly.

Despite extraordinary efforts of many, both in government and nonprofit social services, there are still "twice as many people looking for beds each night as there are beds" in Ada County, and the overall "housing and shelter situation puts a strain on our cities and law enforcement can expect to see increased rates of camping." (*Id.* at 3, 4.) "Federal officials must continue to recognize," Schroeder emphasizes, that other families like the Roberts "will experience homelessness on average for 2 years before receiving a supporting housing referral and may be a continued presence on public land." (Schroeder Report at 12.) Thus, although Brooks can learn from the choices he

9

made that led him to his sentencing before this Court, and the conditions of his probation will redirect those choices toward better ones, the Court cannot craft a sentence any better or different at servicing the purposes set out in 18 USC § 3553 than the sentence set out in both the Plea Agreement and the PSR here.

Respectfully submitted on this 28th day of December, 2023.

/s/Ritchie Eppink

/s/Craig H. Durham

Attorneys for Brooks Roberts